IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
PINE BLUFF DIVISION

ANTHONY LAMAR,
ADC #120479A                                                                                         PLAINTIFF

V.                          CASE NO. 5:17-CV-43-BSM-BD

WENDY KELLEY, *et al*.                                                                    DEFENDANTS

## RECOMMENDED DISPOSITION

### I.   Procedures for Filing Objections:

This Recommended Disposition (Recommendation) has been sent to Chief Judge Brian S. Miller. Any party may file written objections with the Clerk of Court. To be considered, objections must be filed within 14 days. Objections should be specific and should include the factual or legal basis for the objection.

If the parties do not file objections, they risk waiving the right to appeal questions of fact. And, if no objections are filed, Judge Miller can adopt this Recommendation without independently reviewing the record.

### II.  Background:

Plaintiff Anthony Lamar, an inmate at the Varner Unit of the Arkansas Department of Correction (ADC), claims that Defendants Straughn and Jenkins transferred him in retaliation for retaining legal documents. He also claims that Defendants Andrews, Kelley, and Lawrence knew of the retaliation but failed to intervene or take corrective action. (#2; #21; #67)

Defendants have moved for summary judgment, arguing that Mr. Lamar failed to exhaust his retaliation claim against Defendants Jenkins and failed to exhaust his corrective-inaction claim against Defendant Andrews prior to filing this lawsuit.[1] (#78)

Defendants also contend that they are all entitled to summary judgment on the merits of Mr. Lamar's claims. (#78) They maintain that Mr. Lamar was transferred from the Ester Unit to the Varner Unit for health reasons and not for any retaliatory reason. Specifically, they contend that Mr. Lamar's need for a bottom bunk was the reason for his transfer. Mr. Lamar has responded to the Defendants' motion (#97), and it is ready for review.

## III.     **Exhaustion:**

The Prison Litigation Reform Act (PLRA) requires the Court to dismiss any claim filed by a prisoner that was not fully exhausted prior to the date the lawsuit was filed, with limited exceptions. 42 U.S.C. § 1997e(a) It is undisputed that Mr. Lamar did not name Defendants Jenkins and Andrews in any fully exhausted grievance concerning the claims raised in this case. In his response to the Defendants' motion, however, Mr. Lamar argues that he was thwarted in his attempt to exhaust grievances complaining of

---

[1] Previously, Defendants moved for summary judgment contending that Mr. Lamar had failed to exhaust administrative remedies as to corrective-inaction claims against Defendants Kelley and Lawrence. (#26) The motion was denied. (#50) Thereafter, Mr. Lamar added a claim that Defendant Jenkins retaliated against him and that Defendant Andrews failed to take corrective action. He voluntarily dismissed his retaliation claim against Defendant Andrews. (#65; #66)

2

retaliation and that the grievance process was unavailable to him on the issue of corrective inaction. (#97) The Court must determine whether Mr. Lamar's claims against Defendants Jenkins and Andrews fall within one of the narrow exceptions to the exhaustion requirement. *See e.g.*, *Miller v. Norris*, 247 F.3d 736, 740 (8th Cir. 2001); *Foulk v. Charrier*, 262 F.3d 687, 697-98 (8th Cir. 2001).

    A.    Retaliatory Transfer Claims against Defendant Jenkins

Mr. Lamar filed four grievances complaining that he was transferred in retaliation for storing documents: ESU-16-00151; ESU-16-00153; ESU-16-00154; ESU-16-00155. (#21, pp. 23-33) He concedes that he did not name Defendant Jenkins in those grievances but argues that he was prevented from exhausting his claims against Defendant Jenkins because all four retaliatory transfer grievances were rejected at the unit level.

In Grievance ESU-16-00151 Mr. Lamar alleged a *retaliatory* transfer. Through mistake or otherwise, that grievance was not considered a retaliation complaint, but rather, a garden-variety complaint about a transfer, which is a non-grievable matter. (#21, pp. 22-23) However, while grievances ESU-16-00153, ESU-16-00154, and ESU-16-00155 were also initially rejected at the unit level as non-grievable, the Director ultimately determined that the matter should have been investigated. As she noted, "the allegations of *retaliation by staff* due to [Mr. Lamar's] legal documents and storage of them" were investigated. The investigation resulted in a finding that the transfer was

3

based on Mr. Lamar's request or need for a bottom bunk and was not ordered in retaliation for his retention of legal documents. (#21, pp. 25, 28, 31) (emphasis added)

The fact that Mr. Lamar did not specifically name Defendant Jenkins is of no import. The undisputed record shows that there *was an investigation* to determine whether retaliation by ADC *staff* played a part in the decision to transfer Mr. Lamar to a different ADC unit. The defense that Mr. Lamar did not fully exhaust his administrative remedies against Defendant Jenkins by specifically naming her was waived. Because ADC officials investigated the merits of Mr. Lamar's complaint to determine whether *any ADC staff members* orchestrated his transfer as retaliation for protected activity, that investigation is presumed to include both named and unnamed staff members involved in the transfer. *See Hammett v. Cofield*, 681 F.3d 945, 947 (8th Cir. 2012) (holding that "the PLRA's exhaustion requirement is satisfied if prison officials decide a procedurally flawed grievance on the merits").

    B.    Corrective Inaction Claims against Defendant Andrews

Mr. Lamar asserts that ADC staff refused to sign the step-one grievance form he filled out complaining of Defendant Andrews's lack of corrective action. According to Mr. Lamar, he was told that his complaint involved a non-grievable matter. (#98, pp. 26-28, 223) The Defendants argue that Mr. Lamar should have proceeded, nevertheless, to step two after the official refused to sign his step one-grievance form. (#100)

It is undisputed that ADC staff told Mr. Lamar that he could not grieve corrective inaction.[2] (#37, p. 52; #98, pp. 26-29, 223, 227). As explained in the Court's previous partial recommended disposition (#46), by refusing to sign Mr. Lamar's grievance regarding corrective inaction, ADC staff rendered the administrative procedure unavailable. Defendants' failure-to-exhaust defenses are without merit.

V.      **Retaliation:**

To succeed on the merits of his retaliation claim, Mr. Lamar must establish that he engaged in constitutionally protected activity; that defendants took adverse action against him that would chill a person of ordinary firmness from engaging in the activity; and that retaliation was the actual motivating factor for the adverse action. *Lewis v. Jacks*, 486 F.3d 1025, 1028 (8th Cir. 2007); *Revels v. Vincenz,* 382 F.3d 870, 876 (8th Cir. 2004); *Sisneros v. Nix*, 95 F.3d 749,752 (8th Cir. 1996). Even at summary judgment stage of litigation, the prisoner bears the burden of demonstrating that, but for a retaliatory motive, the transfer would not have occurred. *Webb v. Hedrick*, 409 Fed. Appx. 33, (8th Cir. 2010) (unpublished opinion); *see also Sisneros,* 95 F.3d at 752. Without question, a prisoner "carries a substantial burden to prove that retaliation was the actual motivating factor." *Johnson v. Hamilton*, 452 F.3d 967, 973 (8th Cir. 2006)

---

[2] The fact that ADC officials considered corrective inaction non-grievable is supported by other evidence. When Mr. Lamar grieved corrective inaction by Defendant Kelley after this lawsuit was filed, that grievance was deemed a complaint about a transfer and, consequently, non-grievable. (#89, pp. 227-229)

5

A. Undisputed facts

1. Document Retention

On October 17, 2016, Mr. Lamar was transferred within the ADC from the Varner Unit to the Ester Unit so that he could participate in the Advanced Principles and Application for Life (APAL) program. (#99, p. 9) There is no APAL program at Varner. Mr. Lamar brought two large boxes of legal documents with him to the Ester Unit. (#80-3; 99, p. 10)

Initially, Defendant Straughn (Chief Security Officer at the Ester Unit) told Mr. Lamar to send some of his documents home because there were too many to store in the locker in his cell. (#70; #99, p. 10) Mr. Lamar explained that he needed access to all of his documents to proceed with his pending lawsuits. (#99, p. 10) In order to allow Mr. Lamar access to his documents, Corporal McBride (not a named Defendant) agreed to store the boxes in the property room where Mr. Lamar could retrieve documents as needed. (#80-3; #99, pp. 10-11)

2. Mr. Lamar's Health Issues and Need for a Bottom Bunk

At the Varner Unit, there are no bunk beds, so Mr. Lamar enjoyed a bottom bunk while incarcerated there. (#80, p. 6; #99, p. 15) From August 4, 2015 until his transfer to the Ester Unit, Mr. Lamar repeatedly filed health service requests complaining of back, leg, and foot pain. (#80-7, pp. 2, 5, 8-11, 14-16, 21) In 2015 and 2016, he reported that his pain was so great that he could hardly walk. (#80-7, pp. 2, 6, 17-19) In 2015, Mr.

6

Lamar was given a medical script for a cane and a shower chair; he also was prescribed medical footwear. (#80-6) Thus, his complaints of leg and back pain predate his transfer to the Ester Unit.

Upon his transfer to the Ester Unit, Mr. Lamar was assigned to a top bunk. (#99, p. 10) Several days after arriving at the Ester Unit, Mr. Lamar spoke with Defendant Jenkins, an ADC Classification Officer, to request a bottom bunk assignment.[3] (#70; #80-1, p.10; #99, p. 11) On October 25, 2016, Mr. Lamar went to the infirmary for a rash and, while there, requested a prescription for a bottom bunk because of back and leg pain and difficulty accessing his top bunk. The medical staff, however, did not approve his request for a bottom bunk script. (#80-5; #99, pp. 13-14)

On October 25, 2016, Defendant Jenkins sent an email to Valerie Westbrook and Raylina Ramsey (not Defendants) explaining that two inmates in the APAL program who had medical scripts for bottom bunks would have to be returned to their prior units because the Ester Unit did not have enough bottom bunks to accommodate them. (#80-4, p. 9; #99, p. 13)

On October 28, 2016, Mr. Lamar was transferred from the Ester Unit back to the Varner Unit. (#80-4, p. 6; #99, p. 15) After his return to Varner, he continued to complain of pain. (#80-7) In 2017, he was prescribed special shoes, a script to excuse him from

---

[3] The parties dispute whether he informed Defendant Jenkins that he needed the bottom bunk or just wanted one, and whether there were bottom bunks available on the second floor. (#80-1, pp. 12-13; #80-2; #98 p. 5)

climbing stairs, and a bottom bunk script, based on his reports of pain and neuropathy. (#80-6; #80-7)

    B.    Discussion

According to Mr. Lamar, he was transferred back to the Varner Unit because on October 26, 2016, he would not allow Ms. York and Corporal McBride to look through his legal documents to decide which documents he could keep and which he would have to send home. (#98, pp. 2, 6-10) Mr. Lamar asserts that Defendants Jenkins and Straughn simply made up a reason to transfer him that had nothing to do with his bottom bunk request. (#98, p. 2)

In his response to the Defendants' motion for summary judgment, Mr. Lamar disputes that he *needed* a bottom bunk; he states that he just *wanted* one because it was more convenient. (#80-1, pp. 12-13; #98, p.11) The documentary evidence demonstrates, however, that Mr. Lamar had a history of complaining of back and leg pain, neuropathy in his legs, and trouble walking and climbing stairs. For example, several months before his transfer to the Ester Unit, while he was still at Varner, Mr. Lamar submitted a health request form complaining that his, "neuropathy pain is getting worse and I need something for the pain . . . in my left leg and foot as well as my right lower leg. The pain is so severe that it hurts to walk on my left foot." (#80-7, p. 2) Shortly after his return to Varner, he submitted a medical request form stating that he had "over-exerted [his] right knee" and that "at times it will either go out when I'm climbing stairs or goes backwards.

8

It feels unstable when I walk without it being either in my knee brace or wrapped." (#80-7, p.1)

Mr. Lamar concedes that, On October 25, he asked the medical provider at Ester Unit for a bottom bunk script due to pain and difficulty in climbing up and down from the top bunk. (#99, pp. 13-14) He also admits that he was given a medical script for a cane and a shower chair at the Varner Unit in March of 2015 (#99, p. 15), but he objects to the admission of this part of his medical records because the records are from a period "well outside of the date timeline that was on [his medical] authorization form." (#94, p.8) He also objects to consideration of the November 2015 script for medical footwear. (#99, p. 16)

To support his assertion that retaliation was the motive for his transfer from the Ester Unit, Mr. Lamar alleges that there were bottom bunks available on the second floor of the Ester Unit (#98, p. 5) and offers a housing roster from the day he was transferred to prove that there were bottom bunks available (#98, p. 388). Even if a bottom bunk had been available on the second floor, however, that does not prove Mr. Lamar's transfer was motivated by retaliation.

While he was at the Ester Unit, Mr. Lamar requested a bottom bunk from Defendant Jenkins; he asked for a medical script for a bottom bunk from a medical provider; and two days before his transfer, two other inmates with medical scripts for bottom bunks were transferred because they could not be accommodated at the Ester

Unit. Other than Mr. Lamar's assumption that his transfer to Varner was related to his collection of documents, there is no evidence to contradict evidence offered by the Defendants that his transfer to Varner was the result of his repeated requests—and his reported need—for a bottom bunk. Mr. Lamar's suspicions about the motivation for his transfer, even if included in an affidavit, cannot counter the Defendants' evidence that Mr. Lamar apparently needed a bottom bunk due to back and leg pain and neuropathy. *Frevert v. Ford Motor Co.*, 614 F.3d 466, 473 (8th Cir. 2010); *Conolly v. Clark*, 457 F.3d 872, 876 (8th Cir. 2006).

## VI. <u>Corrective Inaction</u>:

A prison official can be held liable for failing to take corrective action in response to a constitutional violation. *Boyd v. Knox*, 47 F.3d 966, 968 (8th Cir. 1995); *Choate v. Lockhart*, 7 F.3d 1370, 1376 (8th Cir. 1993). Because Mr. Lamar cannot prevail on his retaliation claim, however, there was no constitutional violation to correct.

## VII. <u>Conclusion</u>:

Defendants Jenkins and Andrews are not entitled to summary judgment based on Mr. Lamar's failure to exhaust his administrative remedies. All Defendants, including Defendants Jenkins and Andrews, are nevertheless entitled to summary judgment on the merits of Mr. Lamar's claims. The Court recommends, therefore, that the Defendants' motion for summary judgment on the merits (#78) be GRANTED and that Mr. Lamar's

claims be DISMISSED, with prejudice. Mr. Lamar's motion for status update (#107) is DENIED, as moot.

DATED this 1st day of April, 2019.

_____
UNITED STATES MAGISTRATE JUDGE

11